**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

DR. BARBARA BRYANT,          :
                                        :
        Plaintiff,            :
                                          :
v.                                 :         1:05-CV-142 (WLS)
                                        :
DOUGHERTY COUNTY SCHOOL    :
SYSTEM, *et al*.,                 :
                                        :
        Defendants.        :
_____:

## ORDER

Presently pending before the Court are the following motions: Defendants' Motion for Summary Judgment (Doc. 33) and Plaintiff's Motion for Permission to File Plaintiff's Notice of New Authority (Doc. 77).

For the reasons discussed more fully below, Defendants' Motion for Summary Judgment (Doc. 33) is **GRANTED** as to **COUNTS I, II, and III**, and Plaintiff's Motion for Permission to File Plaintiff's Notice of New Authority (Doc. 77) is **DENIED**.  Plaintiff's state law claims, **COUNTS IV, V, VI, and VII**, are **DISMISSED WITHOUT PREJUDICE**.

## BACKGROUND

Plaintiff, Dr. Barbara Bryant, is a black female who was at all times relevant to this matter an employee of Defendant Dougherty County School System (hereinafter "DCSS"), for which she has worked since 1993.  Defendant Dr. Sally Whatley was at all times relevant to this matter the Superintendent of DCSS, a position she has held since 2001.  Defendant Ted Horton was at all times relevant to this matter the Executive Director of Curriculum and Instruction, and is currently retired.

Plaintiff alleges that, between May 2003 and April 2004, Defendants did not promote Plaintiff to four (4) positions to which Plaintiff applied due to unlawful intentional race and sex discrimination against Plaintiff.  While none of the first three (3) positions to which Plaintiff applied was filled, the fourth and final position, Director of Federal Programs/School Improvement, was filled by Robert Youngblood, a white male.  Plaintiff alleges that Defendant Horton discriminated against her while coordinating interviews for the various positions. Plaintiff alleges that Defendant Whatley discriminated against her in the selection process.  And Plaintiff alleges that Defendant DCSS discriminated against her by ratifying the selection of Youngblood over Plaintiff.  Plaintiff also alleges that Defendants subjected her to unlawful retaliation and a hostile work environment.

Plaintiff's seven-count Complaint (Doc. 1) alleges both federal and Georgia state law claims:  **Count I** – race and sex discrimination, hostile work environment, and retaliation pursuant to Title VII; **Count II** – discrimination in the making and enforcement of a contract pursuant to Section 1981; **Count III** – discrimination and retaliation in violation of Plaintiff's constitutional rights under the equal protection and due process clauses of the Fourteenth Amendment pursuant to Section 1983; **Count IV** – tortious interference with an employment relationship pursuant to Georgia law against Defendants Horton and Whatley only; **Count V** – discrimination and retaliation pursuant to Georgia law; **Count VI** – intentional infliction of emotional distress; and **Count VII** – breach of contract.  (Doc. 1).  Defendants move for summary judgment as to the Complaint (Doc. 1) in its entirety.  (Doc. 33).  Each count of the Complaint is addressed separately in the Discussion below.

## FACTUAL SUMMARY

Plaintiff is a black female.  In 1975 she earned a Bachelor of Science Degree in Elementary Education, with a minor in Library Science, from Albany State University.  In 1977, Plaintiff earned a Masters Degree in Education in Early Childhood and Elementary Education. In 1986, Plaintiff earned a Specialist Degree in Elementary Education from Troy State University.  In 1989, Plaintiff earned another Specialist Degree, this time in Administration and Supervision from the University of Georgia.  Plaintiff earned the degree of Doctor in Education from Nova South Eastern University in 1996.

Plaintiff began her employment with DCSS in 1993 as a Title I Reading/Math Supervisor, and thereafter remained in a Title I Supervisor position.  Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 6301 *et seq.*, is a federal program aimed at improving the academic achievement of the disadvantaged.  Other titles exist under the Act, but Title I accounts for the majority of federal funding allocated to DCSS schools.  DCSS had a Title I Director, under whom Plaintiff worked in her capacity as Title I Supervisor.

Prior to May 19, 2003, Larry Medlin, the Title I Director, retired but retained the position as a part-time consultant.  On May 19, 2003, DCSS made an announcement – both within DCSS and externally to the broader community – that it was accepting applications to fill the position of Federal Programs Director.  (Doc. 56 at Pl.'s Ex. 2).  The Federal Programs Director position combined the responsibilities of the Title I Director position with responsibility for overseeing other federal programs and addressing the requirements of the federal No Child Left Behind Initiative.  (Doc. 32 at Def.'s Ex. 5).  On July 14, 2003, four qualified applicants, including Plaintiff, were interviewed by a panel of 12 people.  (Doc. 32 at Def.'s Ex. 3).  The four qualified applicants were comprised of three black females and one black male.  The panel recommended

3

that none of the applicants be selected for the position.  As a result, Medlin continued to serve as a part-time consultant.

On January 30, 2004, DCSS made an in-system announcement that it was accepting applications to fill the position of Federal Programs Coordinator.  (Doc. 56 at Pl.'s Ex. 2).  The position was similar to the previously advertised Federal Programs Director position, but involved a decrease in salary.  Two applications were received, one from Plaintiff and another from Steve Kitchens, a white male.[1]  (Doc. 32 at Def.'s Exs. 45, 46).  Due to the limited response, Defendant Whatley directed that the Federal Programs Coordinator position be re-advertised both internally and externally.

The internal and external Federal Programs Coordinator announcement was posted on February 24, 2004.  (Doc. 56 at Pl.'s 2; Doc. 32 at Def.'s Ex. 6).  When the position was advertised externally, Plaintiff and Mr. Kitchens remained candidates for the position.  On March 18, 2004, seven qualified candidates, including Plaintiff, were interviewed by a panel of 15 people.  (Doc. 32 at Def.'s Ex. 4).  The top two candidates, Joyce King and Dr. Sandra Chavis, both black females, were interviewed by Defendant Whatley.  Following the interviews, Defendant Whatley chose not to recommend either candidate to the DCSS Board of Education for the position.  Instead, due to the retirement of the administrator responsible for school improvement, Defendant Whatley decided to modify the position to include the school improvement duties.  Defendant Whatley also elevated the newly modified position to "director" status, thus increasing the pay.

---

[1]        Plaintiff has attempted to insinuate that the Kitchens application (Doc. 32 at Def.'s Ex. 46) was a fabrication, created to protect Defendants from her discrimination claims, because it was not presented at a December 2004 grievance hearing.  The Court is not persuaded by this argument.  Before the Court is the affidavit of the individual responsible for receiving and maintaining resumes and cover letters for open positions within the school district.  (*See* Doc. 35).  This evidence clearly provides that Steve Kitchens, a white male, also applied for the position of Federal Programs Coordinator.  (*Id.* at ¶ 9).  Regardless, the authenticity of the document is inapposite, because Plaintiff has failed to fulfill the prima facie requirement of showing that the Federal Programs Coordinator position remained open or was filled by a person outside of the protected class.  *See supra* Part II.A.2.a.ii.

On March 25, 2004, DCSS announced both internally and externally that it was accepting applications for the position of Director of Federal Programs/School Improvement. (Doc. 56 at Pl.'s Ex. 2; Doc. 32 at Def.'s Ex. 7). On April 7, 2004, DCSS received Plaintiff's application for the position. (Doc. 32 at Def.'s Ex. 9). On April 6, 2004, DCSS received Youngblood's application for the position. (Doc. 32 at Def.'s Ex. 10).

On April 8, 2004, four of the five qualified applicants were interviewed by a panel of 14 people. (Doc. 32 at Def.'s Ex. 2). The fifth qualified applicant, Plaintiff, was interviewed by the panel on April 12, 2004, following her recovery from an illness. The interview committee tasked with recommending candidates consisted of fourteen educators and administrators from within the School System: four males and ten females; nine African-Americans and five Caucasians. (Doc. 32 at Def.'s Ex. 21). The five candidates for the Director of Federal Programs/School Improvement position were Plaintiff, Larry Worthy, Dr. Anita Brown, Robert Youngblood and Kenneth Goseer. Worthy had been on the July 14, 2003 panel that interviewed Plaintiff for the Federal Programs Director position. (Doc. 32 at Def.'s Ex. 3). The committee asked each candidate nine standard questions. (*See* Doc. 32 at Def.'s Ex. 19). The first four of those questions were the same as the first four questions asked of the Federal Programs Director interviewees. (*Compare* Doc. 32 at Def.'s Ex. 17 *with* Doc. 32 at Def.'s Ex. 19). After the interviews were completed, each committee member was instructed by Defendant Horton to identify two of the five candidates they believed to be most qualified for the position and outline their reasoning in a brief written statement on a standard form provided by DCSS.[2] (*See* Doc. 32 at Def.'s Ex. 16). The recommendations were then tallied (*see id.*), and the two individuals who received the most recommendations from the committee – Youngblood (12 recommendations)

---

[2]     Although the standard form requests the "Top 3 Candidates," the panel members were instructed to only select the top two candidates, as per standard practice in DCSS. As noted by Defendants, one committee member apparently recommended only one candidate.

and Worthy (seven recommendations), both white males – were recommended to Defendant Whatley.   Following interviews of Youngblood and Worthy, Defendant Whatley selected Youngblood for the position.  Plaintiff received only three recommendations from the interview committee, tied with Kenneth Goseer, a black male.   Plaintiff received only one more recommendation than Dr. Anita Brown, a black female, who received two recommendations. The DCSS Board of Education approved Defendant Whatley's recommendation of Youngblood at its regular meeting on April 12, 2004.  (Doc. 56 at Pl.'s Ex. 34).  Youngblood attended a Title I summer training workshop in the summer of 2004.  (Doc. 55 at 61-63).

On April 13, 2004, Plaintiff was informed by a letter from the DCSS Human Resources Director that another candidate was selected for the Director of Federal Programs/School Improvement position.   (Doc. 56 at Pl.'s Ex. 13).   On the same day, Defendant Whatley requested a meeting with Plaintiff to discuss the selection.  (*See* Doc. 32 at Def.'s Ex. 11; Doc. 56 at Pl.'s Ex. 14).  On April 22, 2004, Plaintiff sent a grievance letter to Defendant Whatley. (Doc. 32 at Def.'s Ex. 11).   The letter was subsequently amended on August 4, 2004, to underscore that Plaintiff alleged discrimination on the basis of race and sex.  (Doc. 56 at Pl.'s Ex. 29).

On September 13, 2004,[3] the Atlanta District Office of the United States Equal Employment Opportunity Commission (hereinafter "EEOC") received a Charge of Discrimination from Plaintiff.  (Doc. 1 at Ex. A).   The EEOC charge alleges that DCSS

---

[3]     Plaintiff's Complaint states that her EEOC charge was filed on August 4, 2004.  (Doc. 1 at ¶ 19).  The EEOC charge attached to the Complaint, however, does not indicate that it was filed on that date.  The notary's attestation is dated either "10-08-04" on the first page of the exhibit – meaning August 10, 2004 – or "20 day of 08-04" on the fifth page of the exhibit – meaning August 20, 2004.  (*See* Doc. 1 at Ex. A).  The official stamp on the EEOC charge clearly indicates that it was "RECEIVED" on "SEP 13 2004." (*Id.*).  The EEOC's regulations state that "[c]harges arising in jurisdictions having no FEP agency are filed with the Commission upon receipt."  29 C.F.R. § 1601.13(a)(1).  Because Georgia is a state with no FEP agency, <u>Wilkerson v. Grinnell Corp.</u>, 270 F.3d 1314, 1317 (11th Cir. 2001), the Court finds that the date indicated by the official stamp is the date that Plaintiff's EEOC charge was filed.

discriminated against Plaintiff on the basis of race, color, and sex.   (*Id.*).   The box for "RETALIATION" was not checked.   (*Id.*).   Plaintiff's narrative describes her qualifications, her experience with DCSS, her duties as Title I Supervisor, the various positions she applied for and did not receive, and Youngblood's qualifications.   (*See* Doc. 1 at Ex. A).   The EEOC mailed to Plaintiff a right-to-sue letter on July 27, 2005.   (Doc. 1 at Ex. B).   Plaintiff filed the instant action on October 14, 2005.

## DISCUSSION

**I.   PLAINTIFF'S MOTION FOR PERMISSION TO FILE PLAINTIFF'S NOTICE OF NEW AUTHORITY (Doc. 77)**

Plaintiff has submitted a Motion for Permission to File Plaintiff's Notice of New Authority.   (Doc. 77).   In the motion, Plaintiff brings to the Court's attention several opinions issued in 2008 by the United States Supreme Court and the Eleventh Circuit that Plaintiff contends are relevant in her opposition to Defendants' pending Motion for Summary Judgment. The Court assures Plaintiff that it is duty-bound to consider current cases when deciding all motions, and thus Plaintiff's motion is unnecessary.   Therefore, Plaintiff's Motion for Permission to File Plaintiff's Notice of New Authority (Doc. 77) is **DENIED**.

**II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 33)**

Under Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   Hoffman v. Allied Corp., 912 F.2d 1379, 1383 (11th Cir. 1990).   A fact is "material" if it is a legal element of the claim under the applicable substantive law and it might affect the

outcome of the nonmoving party's case. Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).  A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim.  *See* Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Celotex Corp., 477 U.S. at 323.

The movant bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or "show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must provide "enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 251 (1986)).

On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict.  Celotex Corp., 477 U.S. at 322-23; Allen, 121 F.3d at 646.  However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

8

**A.  Title VII (Count I)**

Count I of Plaintiff's Complaint alleges "Defendants' actions in subjecting Plaintiff to race and sex discrimination, a hostile work environment, and retaliation constitute unlawful intentional discrimination under Title VII." (Doc. 1).  Although not clear from, or acknowledged by, Plaintiff's Complaint, Count I actually alleges four (4) separate causes of action under Title VII: (1) race discrimination, (2) sex discrimination, (3) hostile work environment, and (4) retaliation.

**1.  Individual Defendants**

Title VII of the Civil Rights Act of 1964 prohibits discrimination in the workplace on the basis of race or sex.  42 U.S.C. § 2000e-2(a).  It is undisputed that Plaintiff, a black female, was an employee of Defendant DCSS as defined by 42 U.S.C. § 2000e.  Title VII suits may be brought against a plaintiff's employer and against employees as agents of the employer, but not against employees in their individual capacities.  Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) ("Individual capacity suits under Title VII ... are inappropriate.").  "[B]ecause individual capacity suits are unavailable under Title VII, plaintiffs must sue their employer, but may do so by naming supervisory employees as agents of the employer or by naming the employer directly."  Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1084 (11th Cir. 1996) (citing Busby, 931 F.2d at 772).  Under Title VII, allegedly discriminatory personnel actions taken by an employer's agent only create liability for the employer-entity, and not for the agents themselves.  Bryant has directly named her employer, DCSS, as a Defendant in her Title VII claims.  Accordingly, Bryant's Title VII claims against Defendants Whatley and Horton in their individual and official capacities are inappropriate and Defendants' Motion for Summary

Judgment (Doc. 33) is **GRANTED** as to Plaintiff's Title VII claims against Defendants Whatley and Horton individually.

### 2.  Race and Sex Discrimination

Three methods exist for a plaintiff to establish a prima facie case of discrimination under Title VII: "by presenting direct evidence of discriminatory intent; by meeting the test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); or by demonstrating through statistics a pattern of discrimination." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  Direct evidence of discrimination would be evidence that, if believed, would prove the existence of a fact in issue without inference or presumption. *Id.* (providing an example of direct evidence of age discrimination as a management memorandum stating, "Fire Early – he is too old").

Plaintiff has presented no statistical evidence and has not presented direct evidence of discriminatory intent.  Plaintiff, therefore, must prove her case by satisfying the inferential test set forth in McDonnell Douglas.  The McDonnell Douglas burden-shifting analysis proceeds as follows: (1) a plaintiff must first make out a prima facie case by establishing the four elements articulated below; (2) the burden then shifts to the defendant to produce legitimate, nondiscriminatory reason(s) for the alleged adverse employment action; and (3) the burden shifts back to the plaintiff to establish that any proffered reason(s) is pretextual. McDonnell Douglas Corp., 411 U.S. at 802-04; *see* Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

Despite the shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas framework, "[t]he ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).  To further explain a plaintiff's final burden, the Eleventh Circuit provided that:

> [T]he plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1375-76 (11th Cir. 1996) (citing Burdine, 450 U.S. at 256).  "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." Id. at 1376-77.

### a.  Plaintiff's Prima Facie Case

A prima facie case of hiring or promotion discrimination requires a plaintiff to prove the following things: (1) she belonged to a protected class, (2) she applied for and was qualified for a job for which the employer was seeking applicants, (3) despite these qualifications, she was rejected, and (4) after the rejection, the employer continued to seek applications from persons with similar qualifications or promoted a person outside the protected class.  Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 nn.6-7 (11th Cir. 1983).

Defendants contend that Plaintiff applied for three separate positions: (1) Federal Programs Director, (2) Federal Programs Coordinator (initially advertised internally then both internally and externally), and (3) Director of Federal Programs/School Improvement.  Plaintiff was ultimately not selected for any of the positions.  Defendants' motion proceeds to address Plaintiff's ability, or inability, to establish the requisite prima facie case of discriminatory failure

to promote for each position.  Defendants concede that Plaintiff belonged to the protected classes of black and female, that she applied for each position, and that she was rejected for each position.  In response, Plaintiff merely suggests that Defendants concede her ability to establish the necessary prima facie case without opining as to whether Plaintiff contends the separate positions were really one and the same.  Additionally, Plaintiff summarily contends "[t]he evidence establishes a strong prima facie case of discrimination with regard to the position that Plaintiff was denied.  Plaintiff is a black female, and she was qualified for the position.  She was not chosen for the position, and white male was chosen for this position."  (Doc. 66 at n.2).

The Court will evaluate whether Plaintiff has established a prima facie case for each of the four positions: (1) Federal Programs Director, (2) Federal Programs Coordinator (Internal Only), (3) Federal Programs Coordinator (Internal and External), and (4) Director of Federal Programs/School Improvement.  The Court notes that Plaintiff may have attempted to argue that the four positions should be viewed as one continuing position, because many of the responsibilities involved in the positions relate to Title I, Plaintiff's alleged area of expertise.  The Court rejects this argument.  Even if the job descriptions between the unfilled Federal Programs Director and unfilled Federal Programs Coordinator positions were practically identical, the job description for the filled Director of Federal Programs/School Improvement position was not substantially similar to the previous two.  Most notably, the Director of Federal Programs/School Improvement position included the added responsibilities of School Improvement.  (*Compare* Doc. 32 at Def.'s Ex. 7 *with* Doc. 32 at Def.'s Ex. 5 *and* Doc. 32 at Def.'s Ex. 6).

### i.  Federal Programs Director

A prima facie case of discriminatory failure to promote requires a showing that "other equally or less qualified employees who were not members of the protected class were promoted." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir.2004).  The facts clearly show that the position of Federal Programs Director, which was advertised by DCSS on May 19, 2003, was not filled.  Because Plaintiff has offered no evidence or argument to show that the Federal Programs Director position was filled by someone outside of her protected class, any claim by Plaintiff of discriminatory failure to promote on the basis of race and/or sex pursuant to Title VII must fail as to this individual position.[4]

### ii.  Federal Programs Coordinator (Internal Only)

Regarding the initial Federal Programs Coordinator position, advertised only internally on January 30, 2004, Defendants contend that Plaintiff cannot show the necessary prima facie case for two reasons.  First, Defendants argue – without challenge, opinion, or comment from Plaintiff – that Plaintiff fails to satisfy the third element of the prima facie case because she was not rejected for the position.  Instead, Defendants argue, Plaintiff's internal application was carried over when the position was announced externally, and Plaintiff remained a candidate as part of the larger applicant pool.  The Court disagrees, because Defendant Whatley admitted in deposition that she could have promoted Plaintiff at that time.  The Court therefore views this as a rejection.

Defendants' second argument, however, is one with which the Court agrees.  Just as the Court held above regarding the Federal Programs Director position, because Plaintiff has offered no evidence or argument to show that "other equally or less qualified employees who were not

---

[4]     Defendant also proffers allegedly legitimate, nondiscriminatory reasons for the decision not to promote Plaintiff to the Federal Programs Director position.  However, those arguments are not considered here because where a plaintiff fails to meet her burden to establish a prima facie case, a Court is not inclined to consider the issue any further.  See Burdine, 450 U.S. at 256.

members of the protected class were promoted" to the position of Federal Programs Coordinator that was only advertised internally, any claim by Plaintiff of discriminatory failure to promote on the basis of race and/or sex pursuant to Title VII must fail.[5]

### iii.  Federal Programs Coordinator (Internal and External)

The Federal Programs Coordinator position was advertised both internally and externally on February 24, 2004.  The facts clearly show that the position was not filled.  Once again, because Plaintiff has offered no evidence or argument to show that "other equally or less qualified employees who were not members of the protected class were promoted" to the position of Federal Programs Coordinator, any claim by Plaintiff of discriminatory failure to promote on the basis of race and/or sex pursuant to Title VII must fail.[6]

### iv.  Director of Federal Programs/School Improvement

The Director of Federal Programs/School Improvement position, advertised on March 25, 2004, was ultimately filled to cover the combined duties of the former Title I Director, administrator responsible for school improvement, compliance with the No Child Left Behind Initiative, and requirements of other federal programs.  Defendants concede that Plaintiff satisfies her burden to show the prima facie case for discriminatory failure to promote, on the basis of race and/or sex, regarding the Director of Federal Programs/School Improvement position.  (Doc. 37).

---

[5]     Defendant also proffers allegedly legitimate, nondiscriminatory reasons for the decision not to promote Plaintiff to the Federal Programs Coordinator position.  However, those arguments are not considered here because where a plaintiff fails to meet her burden to establish a prima facie case, a Court is not inclined to consider the issue any further.  *See* Burdine, 450 U.S. at 256.

[6]     Defendant also proffers allegedly legitimate, nondiscriminatory reasons for the decision not to promote Plaintiff to the Federal Programs Coordinator position.  However, those arguments are not considered here because where a plaintiff fails to meet her burden to establish a prima facie case, a Court is not inclined to consider the issue any further.  *See* Burdine, 450 U.S. at 256.

## b.  Defendant's Legitimate Nondiscriminatory Reasons

Because Defendants concede Plaintiff's ability to establish a prima facie case, the burden shifts to Defendants to produce or proffer some legitimate, nondiscriminatory reason for their decision not to promote Plaintiff.  <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-804.  To satisfy their burden of production, Defendants proffer two reasons for the decision not to promote Plaintiff, and Defendants contend both reasons are legitimate and nondiscriminatory.  First, Defendants contend that Plaintiff was not promoted to the Director of Federal Programs/School Improvement position because Plaintiff was not recommended by the interview committee tasked with recommending candidates.  Defendants' second proffered legitimate, nondiscriminatory reason is that the chosen candidate, Youngblood, was more qualified than Plaintiff.  Defendants summarized Mr. Youngblood's qualifications as follows:

> Robert Youngblood has ably served the Dougherty County School System as a teacher, administrator and principal for some 25 years. He is an experienced administrator who is familiar with the Dougherty County School System. He has served as both a high school and elementary school principal. He served as the Director of the System's Summer, Evening & Migrant program. He has experience with the Georgia Accrediting Commission and the Southern Association of Colleges and Schools. He led both Westover High School and Lake Park Elementary School when they were under academic review. He has worked in title I schools. Of the two candidates recommended by the interview committee, the defendant felt Mr. Youngblood best met the needs of the School System for the Director of Federal Programs/School Improvement position.

(Doc. 37).    Additionally, and consistent with Defendants' first proffered legitimate, nondiscriminatory reason, Defendants posit that Youngblood was the most qualified candidate for the position because he received the most recommendations from the interview committee.

## c.  Plaintiff's Proof of Pretext

Under the burden-shifting analysis described above, the burden now rests on Plaintiff to prove that each of Defendant's proffered legitimate reasons was a pretext for discrimination.  In

an attempt to satisfy this burden, Plaintiff's brief in support (Doc. 66) directs a scattershot of arguments against Defendant's proffered legitimate, nondiscriminatory reasons:

(i) Defendants' proffered reasons were not articulated in the rejection letter sent to Plaintiff, and the same were first offered only after the charge of discrimination was filed with the EEOC;

(ii) Plaintiff was the only person to apply for the available position and therefore should have received the position;

(iii) four white employees were previously promoted into other positions without an application process;

(iv) Defendants violated a variety of rules, policies and requirements in the interview process;

(v) there were no objective policies to guide the interview committee;

(vi) Larry Worthy was never interviewed by Defendant Whatley;

(vii) Defendant Whatley had encouraged Youngblood to apply;

(viii) Defendant Whatley considered the Director of Federal Programs/School Improvement as a "white position" in which she had no desire to place Plaintiff, a black female;

(ix) Defendant Whatley changed the position and qualifications to keep Plaintiff from receiving the position;

(x) Defendant Whatley did not fill the position when the two finalists were black females;

(xi)   Worthy had prior knowledge of the answers to the interview questions and then was permitted to be interviewed for the Director of Federal Programs/School Improvement position;

(xii)   one committee member conducted extrinsic research and was aware of the interview questions to be posed to candidates;

(xiii)   the interview committee decided to recommend only two people after the results were revealed and it was clear that the third-place candidate was a black female;

(xiv)   at least two of the interview committee members were unaware of Youngblood's qualifications or lack thereof;

(xv)   Plaintiff was more qualified than Mr. Youngblood;

(xvi)   all of Defendants' proffered reasons are false.

Only some of Plaintiff's numerous arguments (Plaintiff's burden cannot be met merely by the weight of the *number* of arguments), many of them conclusory, relate to Defendants' two proffered reasons: (1) the interview panel did not select Plaintiff for the Director of Federal Programs/School Improvement position, and (2) Youngblood was more qualified than Plaintiff for the position. The Court, guided by Plaintiff's burden to show both that (1) Defendants' proffered reasons were false and (2) discrimination was the real reason for the failure to promote, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 n.4 (1993), will address only those arguments that are relevant to this analysis. Of course, Plaintiff may survive summary judgment by establishing a genuine issue of material fact as to certain facts and/or evidence. Plaintiff may not, however, meet this burden by relying on non-supportive affidavits or bare and self-serving allegations. *See* Bryant v. Rich, 530 F.3d 1368, 1382 (11th Cir. 2008).

### i. Rejection Letter

Plaintiff's argument concerning the rejection letter she received is without force. Defendants concede that the rejection letter did not include the proffered legitimate, nondiscriminatory reasons now before the Court. However, Defendants also note that the purpose of the rejection letter was merely to notify Plaintiff that she was not selected for the Director of Federal Programs/School Improvement position and that another candidate was selected. Therefore, Defendants' failure to include any explanation in the rejection letter for their reasons not to promote Plaintiff is not pretextual. Additionally, Plaintiff has made no showing that such an explanation was required or was an existing policy or practice of DCSS.

### ii. White Employees Promoted Without Application Process

First, Plaintiff offers no source for argument that four white employees were promoted without an application process. Second, clearly none of the four individuals referred to was promoted to the Director of Federal Programs/School Improvement position, which involved an application process. Third, Defendant Whatley's alleged promotion of four white individuals to positions without an application process has no relevance to whether Plaintiff was denied the Federal Programs/School Improvement position due to her sex.[7] Finally, Plaintiff would have to show that whites or other non-members of a protected group were the only employees promoted without an application process as a matter of policy or practice. Therefore, those four alleged promotions alone, even if true, do not adequately support Plaintiff's conclusion of racial discrimination. Therefore, Plaintiff's argument does not establish pretext.

---

[7]    Plaintiff's argument here undermines her allegations of sexual discrimination, because at least one of the white employees she claims were promoted without an application process, Brenda Horton, is female.

### iii.   Various Rule, Policy, and Requirement Violations in Interview Process

Plaintiff points time and again to deviations by Defendants from the various hiring, promotion, and interview procedures found in Document 56, which contains the exhibits from Plaintiff's depositions of eight witnesses.  Those deponents who possessed personal knowledge of the interview process admitted that it had deviated from the written procedure.  Defendants themselves admitted to deviations from the written procedure.

It is well established that "[t]he bending of established rules may ... be suggestive of discrimination."  Walker v. Prudential Prop. & Cas. Ins. Co., 286 F.3d 1270, 1279 (11th Cir. 2002).  To establish pretext, however, "a plaintiff must show that the deviation from policy occurred in a discriminatory manner."  Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). "[T]he mere fact that [an employer] failed to follow its own internal procedures does not necessarily suggest that [it] was motivated by illegal discriminatory intent."  Boykin v. Bank of Am. Corp., 162 F. App'x 837, 839 (11th Cir. 2005).

While Plaintiff has succeeded in finding likely every deviation from the written policy in the interview process, nowhere has Plaintiff shouldered her burden to "show that the deviations occurred in a discriminatory manner."  Rojas, 285 F.3d at 1342.  Therefore, Plaintiff's argument does not establish pretext.

### iv.  No Objective Hiring Standards

Plaintiff argues that the hiring standards adopted by Defendants were not objective, but instead were subjective.  Plaintiff, however, makes this argument in summary fashion, failing to cite to the Court facts indicating the hiring process was subjective.  This qualifies as a "bare and self-serving allegation[]" that cannot be relied upon to defeat summary judgment.  Bryant, 530 F.3d at 1382.  Furthermore, the Court notes that the law does not expect every shred of

subjectivity to be eliminated from the hiring process.  Rather, the expectation is that the hiring process applies sufficient objective standards as to be fair.  Hamilton v. Gen. Motors Corp., 606 F.2d 576, 580 (11th Cir. 1979) ("We do not suggest that an employer may not properly include interviews in its employment process.  The test is one of objective fairness.").  Viewing the record as a whole in a light most favorable to Plaintiff, the Court does not find that the hiring standards were not objectively fair.  Defendants advertised the position, accepted resumes, evaluated those resumes to determine which applicants were qualified for the position, used an independent panel of fourteen people to conduct interviews using nine standard questions regarding candidates' background, knowledge of federal programs, and the typical "greatest strength … greatest weakness" category (Doc. 32 at Def.'s Ex. 19), then chose the two finalists based upon their resumes and answers to the interview questions.  This hardly rises to the level of impermissible subjectivity as was confronted in the case Plaintiff relies upon in making her summary argument, Carmichael v. Birmingham Saw Works.  There, the Eleventh Circuit stated that:

> The defendant used no formal procedures for posting notice of available promotions or for determining who would be offered the promotion. Instead, the company relied on "word of mouth" and informal review procedures. We have recognized that such subjective procedures can lead to racial discrimination, both because important information may be available only to whites and because such procedures place no check on individual biases.

738 F.2d 1126, 1133 (11th Cir. 1984).  Therefore, Plaintiff's argument does not establish pretext.

### v.  Worthy's Knowledge of Interview Questions & Answers

Plaintiff makes the conclusory argument that Worthy, by virtue of having been on the interview panel for the Federal Programs Director position, knew the questions and answers that were presented to him as a candidate for the Director of Federal Programs/School Improvement position.  The Court must explore this argument because it relates to Defendant's proffered

reason that the interview panel recommended only the top two candidates, and Plaintiff had tied for third.

The Court does not see how, even when viewed in a light most favorable to Plaintiff, a reasonable juror could find that Worthy was at an unfair advantage over Plaintiff regarding the interview questions and answers. The two interviews were over eight months apart, allowing the Federal Programs Director questions to become stale in Worthy's mind. Only four of the interview questions were the same between the Federal Programs Director panel and the Director of Federal Programs/School Improvement panel. While the depositions indicate that an answer key was provided to the Federal Programs Director interview committee, that answer key was returned at the end of the interviews and would have provided no assistance to Worthy in answering three of the four repeated questions: "Briefly, summarize your work history and background for us"; "Discuss your expertise in the area of other federal programs [aside from Title I] administered through the school system"; and "Discuss your experience in developing and administering budgets." The fourth repeated question, "What is the purpose of the 'No Child Left Behind' Title I Program," was a question directly related to the position, which a candidate would be ill-advised to come to the interview not knowing. Moreover, and most important to this Court, Plaintiff also knew these questions and the answers to them, having been asked the same questions twice already in the interviews for Federal Programs Director and Federal Programs Coordinator. In fact, Plaintiff's interview for the latter position had occurred less than a month before her interview for the Director of Federal Programs/School Improvement position.

Plaintiff has failed to satisfy her burden to show both that (1) Defendants' proffered reason was false and (2) discrimination was the real reason for the failure to promote.  Therefore, Plaintiff's argument does not establish pretext.

### vi.  Interview Committee Recommended Only Two Candidates

Plaintiff argues that "a reasonable jury could conclude that defendants decided to choose only two (2) applicants after they knew what the results were, and that if they chose three (3), Whatley would have to interview a black female."  (Doc. 66 at n.17).  This argument does not comport with the facts.  First, it was the interview panel, and not Defendants, that chose the two finalists.  Second, each member of the interview panel was instructed to select his or her top two candidates immediately following Plaintiff's April 12, 2004 interview and without discussing their preferences.  It would have been impossible for Defendants to have known, based on the record, the preferences of each member of the interview panel until after they had written their recommendations, and therefore it would have been impossible for Defendants to make a decision to take the top two knowing that Plaintiff would only have landed in third place.

Plaintiff has failed to satisfy her burden to show both that (1) Defendants' proffered reason was false and (2) discrimination was the real reason for the failure to promote.  Therefore, Plaintiff's argument does not establish pretext.

### vii.  Interview Committee Members Ignorant of Youngblood's Qualifications

Plaintiff argues that "[a]t least two panel members on the final panel did not know that Youngblood had been at a Title I school for only one (1) year."  (Doc. 66 at n.17).  Plaintiff does not indicate who those panel members are.  Plaintiff does not argue how this makes Defendants' proffered reasons false.  Furthermore, Plaintiff does not articulate how this shows race- and/or gender-based animus on the part of Defendants.  Plaintiff has failed to satisfy her

burden to show both that (1) Defendants' proffered reason was false and (2) discrimination was the real reason for the failure to promote.  Therefore, Plaintiff's argument does not establish pretext.

### viii.  Plaintiff More Qualified Than Youngblood

Plaintiff asserts that "Defendants have not introduced a scintilla of evidence, including any comparative evidence, to show how the qualifications of Youngblood were superior to those of Plaintiff."  (Doc. 66 at 25).  The Court reminds Plaintiff that the burden rests on her, not on Defendants.

The federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions."  Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1501 (11th Cir. 1991).  Rather, the court's interest lies in whether the plaintiff produced sufficient evidence to demonstrate an actual intent on the part of defendant to discriminate on the basis of a protected trait.  Id. at 1501-02.  The court "will not second guess [the employer's] decision to emphasize qualifications over length of service."  Cofield v. Goldkist, Inc., 267 F.3d 1264, 1269 (11th Cir. 2001).

It is not enough for Plaintiff to simply state that she was more qualified than Youngblood for the available position.  See Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253-55 (11th Cir. 2000).  Of course, such evidence may be "probative" of whether Defendants' proffered legitimate reason was pretextual.  See id. at 1253.  However, evidence of allegedly superior qualifications is only sufficient to establish pretext if a plaintiff's qualifications are so clearly or substantially greater than the person chosen for the position that a reasonable fact finder could infer discrimination from the comparison.  See id. at 1255.  Described more colorfully, the plaintiff "must adduce evidence that the disparity in qualifications is 'so apparent as virtually to jump off the page and

slap you in the face.'" Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001) (quoting Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir. 2001)).  The court's "relevant inquiry ..., then, is not to judge which employee was more qualified, but to determine whether any disparity between ... qualifications is so great that a reasonable fact-finder could infer that [the employer] did not believe [the person promoted] to be better qualified." *Id.*

Comparing Plaintiff's resume submitted for the Director of Federal Programs/School Improvement position (Doc. 32 at Def.'s Ex. 9) with that of Youngblood (Doc. 32 at Def.'s Ex. 10), the Court notes differences.  Plaintiff, for instance, holds a Doctor of Education degree, placing her at the L-7 certification level, while Youngblood holds a Specialist Degree in Administration/Supervision, an L-6 certification level.  This difference, however, does not show that Plaintiff was "so clearly more qualified for the position than [the person promoted] that a reasonable juror could infer discriminatory intent from the comparison." Lee, 226 F.3d at 1255. The advertisement for the Director of Federal Programs/School Improvement position states that an L-5 is required.  (Doc. 32 at Def.'s Ex. 7).  It is not as if Youngblood was promoted over Plaintiff while holding only a Bachelor's Degree, which is below an L-5.  Additionally, Plaintiff's professional experience had been exclusively in the Title I arena since 1993 and was preceded by an Assistant Principal position.  Youngblood's most recent professional experience had included 10 years as a Principal at the elementary and high school levels, and coordinating various other programs in the School System.  This does not strike the Court as being so great a disparity in qualifications as to infer discrimination.  Finally, the 14-member interview panel, half of which consisted of black females, gave 12 of its 27 votes[8] to Youngblood, while Plaintiff received only three votes.  The panel, which Plaintiff agreed was both racially and sexually

---

[8]     The 27 votes were derived from the 13 panel members who recommended two candidates, and the one panel member who recommended only one candidate.

diverse (Doc. 32 at 117), seemed to deem Youngblood a more-qualified candidate for the position following the interviews of both Youngblood and Plaintiff.

The evidence before the Court does not reveal a disparity in qualifications so striking as to support a finding of intentional discrimination in violation of Title VII.  Furthermore, any alleged disparity is certainly not so striking as to "jump off the page and slap [the Court] in the face."  *See* Deines, 164 F.3d at 280.  Instead, the evidence shows that Plaintiff has a great deal of educational and professional experience.  However, based on the interviews conducted by the panel, Youngblood emerged as the more-qualified candidate.  Even if the Court considered Plaintiff the most qualified candidate, this alone would not expose Defendant to Title VII liability, because this Court should not, and therefore will not, act as a "super-personnel department" by questioning Defendant's business judgment, particularly where the record does not show that the person promoted was unqualified for the position.  *See* Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002); Walker v. Mortham, 158 F.3d 1177, 1190 (11th Cir. 1998).

### d.  Conclusion

Accordingly, based on the above analysis and findings of fact, Plaintiff has failed to show that Defendants' proffered legitimate nondiscriminatory reasons for denying Plaintiff the promotion to Director of Federal Programs/School Improvement were pretextual.  Therefore, under the McDonnell Douglas framework, the Title VII racial discrimination count (Count I) of Plaintiff's Complaint must fail.

Unfortunately for Plaintiff, this is not a case where seemingly innocuous events/actions combine to reveal a strong circumstantial case of discrimination.  Instead, each argument in favor of pretext fails to meet the requirement of showing that Defendants' proffered reasons were

untrue and that the true reason was discrimination.  Furthermore, when taken together, Plaintiff's various arguments merely paint a jumbled, confusing picture essentially supported only by her beliefs.  Plaintiff's subjective beliefs are not evidence of intentional discrimination.

Therefore, because Plaintiff failed to establish a prima facie case of racial and sexual discrimination under Title VII, summary judgment is **GRANTED** as to Plaintiff's Title VII race and sex discrimination claim.

### 3.  Retaliation

The anti-retaliation provision of Title VII prohibits discrimination against an employee for engaging in activity deemed protected under the statute.  42 U.S.C. § 2000e-3(a).  A claim brought under this provision based on circumstantial evidence is analyzed using the McDonnell Douglas burden-shifting model.  Corbitt v. Home Depot U.S.A., Inc., 573 F.3d 1223, 1242 (11th Cir. 2009).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in protected speech; (2) she suffered an adverse employment action; and (3) there was a causal relationship between the two events.  *See* Pennington v. City of Huntsville, 261 F.3d 1262 (11th Cir. 2001).  Once Plaintiff has established a prima facie case, Defendants must provide a legitimate, non-retaliatory reason for the adverse employment action.  Crawford v. Carroll, 529 F.3d 961, 976 (11th Cir. 2008).  In order to prevail, the burden shifts to Plaintiff to show that the proffered explanation was a mere pretext for retaliation.  *See* Silvera v. Orange County Sch. Bd., 244 F.3d 1253 (11th Cir. 2001).

Prior to filing a claim under Title VII, however, a plaintiff must first exhaust her administrative remedies.  Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) (citing Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999)).  Exhaustion requires, in part, that a plaintiff file a Charge of Discrimination with the Equal Employment Opportunity

Commission (hereinafter, "EEOC"). *See id.* (citing 42 U.S.C. § 2000e-5(b); Alexander v. Fulton County, 207 F.3d 1303, 1332 (11th Cir. 2000)). The plaintiff must file an EEOC charge within 180 days[9] of the alleged discrimination. *See* Everett v. Cobb County Sch. Dist., 138 F.3d 1407, 1410 (11th Cir. 1998). The purpose of the exhaustion requirement is to give the EEOC the information it needs to investigate and resolve the dispute between the employee and the employer. Andrews-Willmann v. Paulson, 287 F. App'x 741, 745 (11th Cir. 2008). Therefore, a plaintiff may not allege new acts of discrimination before the district court that were not included in the EEOC Charge of Discrimination. *See, e.g.*, Jerome v. Marriott Residence Inn Barcelo Crestline/AIG, 211 F. App'x 844, 846-47 (11th Cir. 2006) (holding that plaintiff's disparate pay claim had not been not properly filed with the EEOC, and therefore could not be raised before the district court, when plaintiff had only alleged facts to the EEOC supporting his denial of promotion claim, notwithstanding the fact that plaintiff had circled "wages" on the EEOC questionnaire). Plaintiffs may, however, bring claims that "amplify, clarify, or more clearly focus" allegations in the EEOC charge. Gregory v. Ga. Dep't of Human Resources, 355 F.3d 1277, 1279-80 (11th Cir. 2004).

Defendants argue that summary judgment should be granted on Plaintiff's retaliation claim for failure to exhaust administrative remedies, because Plaintiff did not check the box for "RETALIATION" on her EEOC Charge of Discrimination and did not otherwise illustrate retaliation in her description of Defendant's allegedly improper conduct on the charge form. (Doc. 37). The Court agrees that Plaintiff's EEOC charge is devoid of information that would induce the EEOC to investigate any alleged retaliation against Plaintiff. (Doc. 1 Ex. A); *see*

---

[9]        The 300-day time period is utilized in those states that have entities with the authority to grant or seek relief with respect to unlawful employment practices and an employee files a grievance with that agency; in all other states, known as "non-deferral states," the charge must be filed within 180 days. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). Because Georgia is a non-deferral state, the 180-day time period applies. Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 (11th Cir. 2003).

Hillemann v. Univ. of Central Fla., 167 F. App'x 747, 749-50 (11th Cir. 2006) ("The EEOC could not reasonably be expected to investigate ... retaliation when the charge form presented no indication that such considerations might have played a role in UCF's failure to hire Plaintiff.").

Plaintiff, however, cites the old Fifth Circuit case of Gupta v. E. Tex. State Univ., 654 F.2d 411 (5th Cir. (Unit A) 1981), to argue that an EEOC filing was not a prerequisite for her retaliation claim.  (Doc. 66 at n.24).  This is referred to in the Eleventh Circuit as the "Gupta rule," see Hargett v. Valley Fed. Sav. Bank, 60 F.3d 754, 761-62 (11th Cir. 1995), and is good law in this circuit under Bonner v. City of Pritchard.  See Bonner, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting as binding precedent in the Eleventh Circuit all former Fifth Circuit decisions rendered before October 1, 1981).  In its entirety, the Gupta rule states:

> [W]e hold that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim *growing out of an earlier charge*; the district court has ancillary jurisdiction to hear such a claim *when it grows out of an administrative charge* that is properly before the court.
>
> There are strong practical reasons and policy justifications for this conclusion.  It is the nature of retaliation claims that they *arise after the filing of the EEOC charge*.  Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case—a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII.  *See* Held v. Missouri Pacific Railroad Co., 373 F. Supp.[ 996,] ... 1001[ (S.D. Tex. 1974)], and National Organization for Women v. Sperry Rand Corp., 457 F. Supp. 1338, 1344 (D. Conn. 1978).  We are reluctant to erect a needless procedural barrier to the private claimant under Title VII, especially since the EEOC relies largely upon the private lawsuit to obtain the goals of Title VII.  National Organization for Women v. Sperry Rand Corp., 457 F. Supp. at 1344; Sanchez v. Standard Brands, Inc., 431 F.2d 455, 460-61 n.1 (5th Cir. 1970).  Intertwined with this practical reason for our holding is a strong policy justification.  Eliminating this needless procedural barrier will deter employers from attempting to discourage employees from exercising their rights under Title VII.  National Organization for Women v. Sperry Rand Corp., 457 F. Supp. at 1344.

Gupta, 654 F.2d at 414 (emphasis added).  The facts of the Gupta decision make clear that the court's exclusive focus was on retaliation arising out of the filing of the EEOC charge.  *See id.* at

413 ("Gupta contends that his nonrenewal was in retaliation for his filing charges with the EEOC; however, he never filed a third charge with the EEOC alleging retaliatory discharge.") The limited reach of the Gupta rule is therefore obvious: its pardon of an employee's failure to exhaust administrative remedies applies only to retaliation motivated by the employee's prior act of filing an EEOC charge.  No other exercise of an employee's protected right, including the filing of a grievance with one's employer, is covered by the ambit of the Gupta rule.  This Court must follow the Gupta rule, and therefore will apply it if Plaintiff shows that Defendants' retaliatory acts grew out of the filing of her EEOC charge on September 13, 2004.

Plaintiff has failed to show that Defendants' alleged retaliatory acts grew out of the filing of her EEOC charge on September 13, 2004.  Even though Footnote 24 of Plaintiff's brief in support (Doc. 66) cites the *law* of the Gupta rule, the Court does not see where Plaintiff makes any attempt to show *facts* – in satisfaction of her ever-present burden – that Defendants' alleged acts of retaliation grew out of the filing of her EEOC charge.  The following are all of the facts[10] provided in Plaintiff's section entitled "PLAINTIFF FACED NUMEROUS ACTS OF RETALIATION":

(i)     "Whatley knew Plaintiff had complained of discrimination prior to the April 23, 2004, meeting because she told Plaintiff that she (Whatley) thought Plaintiff had gotten enough of going to the board." (Doc. 66 at 26).

(ii)    "[T]wo board members told Plaintiff that she had been discriminated against." (Doc. 66 at n.25).

---

[10]     As opposed to summary (and borderline self-serving) statements such as: (i) "Clearly, the actions of defendants would discourage Plaintiff from complaining of discrimination" (Doc. 66 at 26); (ii) "Defendants knew that Plaintiff had engaged in protected activity prior to the time that Plaintiff was discriminated against" (Doc. 66 at n.25); and (iii) "Clearly, all of the actions were done because Plaintiff had engaged in protected activity and they are illegal" (Doc. 66 at n.25).

  (iii) "[A]ll of the negative employment actions that Plaintiff received were retaliatory acts and adverse employment actions."  (Doc. 66 at n.25).

  (iv) "Plaintiff complained about discrimination to her supervisors prior to the time of any adverse employment actions.  In this case, the evidence shows that after Plaintiff complained of discrimination, she was not allowed to help Youngblood, although she had trained every other person who had come into the office."  (Doc. 66 at n.25).

To summarize, the facts upon which Plaintiff bases her claim of retaliation are: (1) a complaint of discrimination predating April 23, 2004; (2) legal conclusions allegedly made by two unidentified laypeople; (3) her repeated non-promotions; and (4) a complaint of discrimination to her supervisors leading to an alleged adverse employment action.  The Court notes the glaring omission of any mention of the September 13, 2004 filing of Plaintiff's EEOC charge.  Aiding to place these proffered facts in context are a pair of cases described by Plaintiff in her brief in support (Doc. 66).  First, her Footnote 25 opens by citing a case for the proposition that "[p]rotection for retaliation under Title VII extends to employees who *informally voice complaints to supervisors*."  (Doc. 66 at n.25) (emphasis added).  Second, Footnote 25 cites another case whose facts state that "the adverse action started after that [p]laintiff *had a grievance meeting with his supervisors* to protest a suspension."  (Doc. 66 n.25) (emphasis added).  The bedrock of Plaintiff's retaliation argument, therefore, is her grievance communications with Defendant Whatley on and before April 23, 2004.

  By dissecting the assembled prose of Plaintiff's brief in support (Doc. 66), the Court finds the essence of Plaintiff's argument to be this: *I exercised my protected right to file grievances of discrimination with my employer, and then my employer did not promote me and*

*no longer allowed me to train others*.  Nowhere, then, does Plaintiff show that her claim of retaliation "grows out of" the filing of her EEOC charge.  Unlike the plaintiff in <u>Gupta</u>, Plaintiff does not "contend[] that [her] [adverse employment action] was in retaliation for [her] filing charges with the EEOC."  <u>Gupta</u>, 654 F.2d at 413.  Therefore, the <u>Gupta</u> rule does not apply to Plaintiff.

Without the <u>Gupta</u> rule in effect, Plaintiff's only hope of surviving summary judgment is to show that she exhausted her administrative prerequisites regarding her retaliation claim.  Plaintiff has made no such showing.  As stated above, the Court finds that Plaintiff, in her September 13, 2004 EEOC charge, failed to either check the "RETALIATION" box or provide in her narrative even a scintilla of information that would have caused the EEOC to inquire into a possible retaliation claim.  (*See* Doc. 1 Ex. A).  In no way does Plaintiff's retaliation claim "amplify, clarify, or more clearly focus" the allegations in her EEOC charge, all of which pertain solely to a claim of racial and sexual discrimination.  *See* <u>Gregory v. Ga. Dep't of Human Resources</u>, 355 F.3d 1277, 1279-80 (11th Cir. 2004).  Furthermore, the record contains no other EEOC charge filed by Plaintiff requesting that the EEOC investigate a retaliation claim.

Although Plaintiff might have persuaded this Court that a genuine issue of material fact existed regarding retaliation growing out of her grievances, Plaintiff failed to give the EEOC its mandatory shot at resolving the alleged retaliation dispute between her and Defendants.  *See* <u>Andrews-Willmann v. Paulson</u>, 287 F. App'x 741, 745 (11th Cir. 2008).  Therefore, because Plaintiff failed to exhaust her administrative remedies regarding her Title VII retaliation claim, summary judgment is appropriate.  *See, e.g.*, <u>Ramon v. AT & T Broadband</u>, 195 F. App'x 860, 866 (11th Cir. 2006) ("Ramon did not check the retaliation box on the EEOC charge form and failed to illustrate in the charge her claim later made in the complaint that the relocation from the

31

provisioning department to the BSAC was a result of her complaints and STD leave seeking. Because ... a retaliation ... claim could [not] have reasonably been expected to grow of the allegations made by Ramon in her EEOC charge, the district court did not err by finding that she failed to exhaust those claims."); <u>Hillemann v. Univ. of Central Fla.</u>, 167 F. App'x 747, 749-50 (11th Cir. 2006) (affirming summary judgment for retaliation when "[t]he EEOC charge was silent about ... retaliation."); <u>Green v. Elixir Inds., Inc.</u>, 152 F. App'x 838, 840 -41 (11th Cir. 2005) (affirming summary judgment for retaliation because "all of the factual allegations contained in Green's EEOC charge relate to his termination and none relate to a retaliation claim").

Even if Plaintiff's proffered facts can somehow be construed to show that her claim of retaliation "grows out of" the filing of her EEOC charge, thereby obtaining the <u>Gupta</u> rule's pardon of her failure to exhaust, she has nevertheless failed to establish her prima facie case of retaliation. Plaintiff's further shortcoming is in satisfying the third prima facie element: causation. Said the Eleventh Circuit:

> In order to establish the requisite "causal link" required as part of a prima facie case, a plaintiff need only establish that the protected activity and the adverse action were not wholly unrelated. *At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action.* The defendant's awareness of the protected statement, however, may be established by circumstantial evidence.

<u>Corbitt v. Home Depot U.S.A., Inc.</u>, 573 F.3d 1223, 1243 (11th Cir. 2009) (quoting <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993)) (emphasis added). Furthermore, "'while we have held that awareness of protected expression may be established based on circumstantial evidence, our cases have required plaintiffs to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories.'" *Id.* (quoting <u>Raney v. Vinson Guard Serv., Inc.</u>, 120 F.3d 1192, 1197 (11th Cir. 1997)).

Nowhere does Plaintiff generally establish, with evidence sufficient to satisfy the standard set by the Eleventh Circuit, that Defendants were actually aware of the filing of her EEOC charge at the time they allegedly took the adverse employment action proffered in Plaintiff's brief in support: "[Plaintiff] was not allowed to help Youngblood, although she had trained every other person who had come into the office."[11]  (Doc. 66 at n.25).  Plaintiff states in her brief that "the evidence shows that after Plaintiff complained of discrimination," the adverse employment action occurred (Doc. 66 at n.25).  This fails the Eleventh Circuit's requirement for "more evidence than mere curious timing coupled with speculative theories" – in fact, Plaintiff's statement lacks a theory, settling for merely observing a "curious timing."  See Corbitt, 573 F.3d at 1243.  Furthermore, Plaintiff failed to aid the Court in citing where such evidence is located in the record.  After searching the record, the scant evidence the Court could find to support Plaintiff's retaliation claim was Plaintiff's affidavit filed with her brief, which states:

> After I complained of discrimination, I experienced a continuous pattern of negative and adverse job actions. … After I complained, I was not allowed to train incoming employees.  I was not allowed to train Youngblood because Whatley and the DCSS knew that he did not have qualifications or experience in Title I.

(Doc. 63 at ¶ 7).  This evidence fails to establish Defendants' knowledge of the filing of her EEOC charge: the statement does not even mention the EEOC charge, let alone allege that Defendants were aware that the EEOC charge had been filed.  Because Plaintiff did not establish that Defendants were actually aware of her filing of the EEOC charge at the time they allegedly

---

[11]    Although Plaintiff also argues that "all of the negative employment actions that Plaintiff received were retaliatory acts" (Doc. 66 at n.25), it would be a logical fallacy to argue that Defendants were actually aware of Plaintiff's EEOC charge at those times.  All of the instances in which Plaintiff was not promoted predate the filing of the EEOC charge, and one cannot be actually aware of that which has not yet occurred.  See Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000) (finding no causal relationship because adverse employment action had occurred prior to plaintiff's exercise of statutorily protected speech).

disallowed her from training Youngblood, Plaintiff failed to establish the "causal link" required in her prima facie case.  Summary judgment is therefore appropriate.

Because Plaintiff failed to both (1) exhaust her administrative remedies regarding her claim of retaliation and (2) establish a prima facie case of retaliation, summary judgment is **GRANTED** as to Plaintiff's Title VII retaliation claim.

### 4.  Hostile Work Environment

The Gupta rule, described above, does not apply to hostile work environment claims under Title VII.  *See* Gupta, 654 F.2d at 414 (not including hostile work environment in discussion).  Therefore, prior to filing a claim under Title VII, such as a hostile work environment claim, a plaintiff must first exhaust her administrative remedies.  Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) (citing Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999)).  Exhaustion requires, in part, that a plaintiff file a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter, "EEOC").  *See id.* (citing 42 U.S.C. § 2000e-5(b); Alexander v. Fulton County, 207 F.3d 1303, 1332 (11th Cir. 2000)).A plaintiff may not allege new acts of discrimination before the district court that were not included in the EEOC Charge of Discrimination.  *See, e.g.*, Jerome v. Marriott Residence Inn Barcelo Crestline/AIG, 211 F. App'x 844, 846-47 (11th Cir. 2006) (holding that plaintiff's disparate pay claim was not properly filed with the EEOC when plaintiff only alleged facts supporting his denial of promotion claim, notwithstanding the fact that plaintiff circled "wages" on the EEOC questionnaire).  Plaintiffs may, however, bring claims that "amplify, clarify, or more clearly focus" allegations in the EEOC charge.  Gregory v. Ga. Dep't of Human Resources, 355 F.3d 1277, 1279-80 (11th Cir. 2004).

A hostile work environment claim is established when it is shown that "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Plaintiff's EEOC Charge of Discrimination makes no such showing. Rather, the EEOC charge merely states the timeline of the various positions to which Plaintiff had applied, provides Plaintiff's qualifications, and compares them with Youngblood's qualifications. (Doc. 1, Ex. A). This is similar to the contents of the EEOC charge in Green v. Elixir Inds., Inc., 152 F. App'x 838 (11th Cir. 2005), in which the Eleventh Circuit affirmed the district court's failure-to-exhaust finding because "[n]othing in Green's EEOC charge related to incidents of harassment, nor did anything mention the dates on which they occurred." 152 F. App'x at 841. Likewise, in Ramon v. AT & T Broadband, 195 F. App'x 860 (11th Cir. 2006), the Eleventh Circuit affirmed the district court's decision because the plaintiff had made "no allegation in her EEOC charge that reasonably points to the kind of pervasive and oppressive conditions that would allow us to conclude that she intended to have the EEOC investigate the workplace for a hostile work environment." 195 F. App'x at 866. Therefore, summary judgment is **GRANTED** as to Plaintiff's Title VII hostile work environment claim.

### 5.  Conclusion

As discussed above, the Court has found summary judgment appropriate as to all three of Plaintiff's Title VII claims: racial discrimination, retaliation, and hostile work environment. Therefore, Defendant's Motion for Summary Judgment (Doc. 33) is **GRANTED** as to Plaintiff's **Count I**.

**B.  42 U.S.C. § 1981 (Count II)**

Section 1981 guarantees to all persons in the United States "the same right ... to make and enforce contracts ... as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  In 1991, Congress passed the Civil Rights Act of 1991, which amended Section 1981 in response to the Supreme Court's decision in <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164 (1989), which held that Section 1981 did not address discriminatory conduct that occurred after the making of the contract that did not interfere with the plaintiff's enforcement of his or her contractual rights. <u>Bishop v. Avera</u>, 177 F.3d 1233, 1235 (11th Cir. 1999).  The Civil Rights Act of 1991 amended Section 1981 to broaden the definition of "make and enforce contracts" to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b); <u>Bishop</u>, 177 F.3d at 1235.

A claim under Section 1981 has the same requirements of proof and uses the same analytical framework as a claim under Title VII.  <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998).  The <u>McDonnell Douglas</u> framework, therefore, "also applies to claims brought under 42 U.S.C. § 1981, which requires the plaintiff to prove intentional discrimination." <u>Howard v. BP Oil Co.</u>, 32 F.3d 520, 524 n.2 (11th Cir. 1994).  As detailed above, the Court finds that Plaintiff failed to meet her burden under <u>McDonnell Douglas</u> regarding her claims of race and sex discrimination.  Therefore, Defendant's Motion for Summary Judgment (Doc. 33) is **GRANTED** as to Plaintiff's **Count II**.

**C.  42 U.S.C. § 1983 (Count III)**

**1.  Discrimination In Violation Of Fourteenth Amendment**

The Eleventh Circuit recognizes a Section 1983 claim of discrimination against municipal employers and employees as wholly distinct from such claims under Title VII.

Thigpen v. Bibb County, Ga., Sheriff's Dep't, 223 F.3d 1231, 1239 (11th Cir. 2000).  As in the Title VII context, however, the Eleventh Circuit evaluates Section 1983 discrimination claims supported by circumstantial evidence – as opposed to those supported by direct or statistical evidence – using the McDonnell Douglas framework.  Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1082-83 (11th Cir. 1996); see Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1275 n.5 (11th Cir. 2008) ("Title VII and [S]ection 1983 claims have the same elements where the claims are based on the same set of facts.").  As detailed above, the Court finds that Plaintiff failed to meet her burden under McDonnell Douglas regarding her claims of race and sex discrimination.  Therefore, summary judgment is **GRANTED** as to Plaintiff's Section 1983 claims of discrimination.

### 2.  Retaliation In Violation of Fourteenth Amendment

Plaintiff appears to assert a retaliation claim based on the Equal Protection Clause of the Fourteenth Amendment.  (Doc. 1).  "The right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation."  Ratliff v. DeKalb County, 62 F.3d 338, 340 (11th Cir. 1995) (emphasis in original).   Summary judgment is therefore **GRANTED** as to Plaintiff's Fourteenth Amendment retaliation claims brought via Section 1983.

### 3.  Conclusion

As discussed above, the Court has found summary judgment appropriate as to both of Plaintiff's Section 1983 claims: discrimination and retaliation.  Therefore, Defendant's Motion for Summary Judgment (Doc. 33) is **GRANTED** as to Plaintiff's **Count III**.

### D.  Pendent Jurisdiction over State Law Claims (Counts IV – VII)

Since the Court has dismissed all of Plaintiff's federal claims, it is no longer appropriate for the Court to exercise pendent jurisdiction over Plaintiff's state law claims for tortious interference with an employment relationship (Count IV); discrimination and retaliation pursuant to Georgia law (Count V); intentional infliction of emotional distress (Count VI); and breach of contract (Count VII).   *See* Roper v. Edwards, 815 F.2d 1474, 1477-78 (11th Cir.1987). Accordingly, the Court has not reached a decision on the merits of the pending state law claims against Defendants; therefore Plaintiff's **Counts IV-VII** are **DISMISSED WITHOUT PREJUDICE**.

### CONCLUSION

For the reasons articulated above, Defendant's Motion for Summary Judgment (Doc. 33) is **GRANTED** as to **COUNTS I, II, and III**, and Plaintiff's Motion for Permission to File Plaintiff's Notice of New Authority (Doc. 77) is **DENIED**.   It is herby **ORDERED AND ADJUDGED** that Plaintiff shall take nothing by her Complaint, and **JUDGMENT** shall be entered in favor of Defendants.  Plaintiff's state law claims, **COUNTS IV, V, VI, and VII**, are **DISMISSED WITHOUT PREJUDICE**.

SO ORDERED, this  _28th_  day of September, 2009.


_/s/  W. Louis Sands_____
**THE HONORABLE W. LOUIS SANDS,**
**UNITED STATES DISTRICT COURT**